# EXHIBIT 1

1

**HOUSING RIGHTS CENTER**
D. Scott Chang #146403

2
Azadeh Hosseinian #306141
3255 Wilshire Blvd., Suite 1150

3
Los Angeles, California 90010
Telephone: (213) 387-8400 ext. 1116

4
Facsimile: (213) 381-8555
schang@housingrightscenter.org

5

6
**NATIONAL FAIR HOUSING ALLIANCE**
Morgan Williams

7
1101 Vermont Ave., N.W. Suite 710
Washington, D.C. 20005

8
(202) 898-1661
mwilliams@nationalfairhousing.org

9
Attorneys for Amici Curiae
NATIONAL FAIR HOUSING ALLIANCE; HOUSING RIGHTS CENTER; EDEN COUNCIL

10
FOR HOPE AND OPPORTUNITY; FAIR HOUSING ADVOCATES OF NORTHERN
CALIFORNIA; FAIR HOUSING COUNCIL OF ORANGE COUNTY; FAIR HOUSING

11
COUNCIL OF RIVERSIDE, INC.; FAIR HOUSING COUNCIL OF THE SAN FERNANDO
VALLEY; FAIR HOUSING FOUNDATION; FAIR HOUSING NAPA VALLEY and INLAND

12
FAIR HOUSING & MEDIATION BOARD

13
UNITED STATES DISTRICT COURT

14
NORHTERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

15
ISMAEL JIMENEZ, YOLANDA JIMENEZ,

16
ANGELES JIMENEZ, ANTONIO
JIMENEZ, CARMENTINA HERRERA,

17
LUIS ALVAREZ, EBARISTO ALAVEZ,
JOSEFA JIMENEZ, JESUCITA ORTIZ,

18
RODOLFO ROBLES, and PROJECT
SENTINEL, a California non-profit

19
corporation, on behalf of itself and the general
public,

20
                              Plaintiffs,

21
v.

22

23
DAVID TSAI, UNDINE TSAI, and SHANG
SHEN,

24
                              Defendants

25

CASE NO. 5:16-CV-4434-EJD

CORRECTED BRIEF OF AMICI
CURIAE NATIONAL FAIR HOUSING
ALLIANCE; HOUSING RIGHTS
CENTER; EDEN COUNCIL FOR HOPE
AND OPPORTUNITY; FAIR HOUSING
ADVOCATES OF NORTHERN
CALIFORNIA; FAIR HOUSING
COUNCIL OF ORANGE COUNTY;
FAIR HOUSING COUNCIL OF
RIVERSIDE, INC.; FAIR HOUSING
COUNCIL OF THE SAN FERNANDO
VALLEY; FAIR HOUSING
FOUNDATION; FAIR HOUSING NAPA
VALLEY and INLAND FAIR HOUSING
& MEDIATION BOARD IN SUPPORT
OF PLAINTIFF PROJECT SENTINEL'S
OPPOSITION TO DEFENDANTS'
MOTION TO DISMIS

26
Date: October 5, 2017
Time: 9:00 a.m.

27
Room: Courtroom 4, 5th Floor
Courtroom of the Hon. Edward J. Davila

28

- i -

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. ii

INTEREST OF AMICI CURIAE............................................................................ 1

STANDARD OF REVIEW.................................................................................... 2

ARGUMENT………….......................................................................................... 3

    I. THE FAIR HOUSING ACT PROVIDES FOR ENFORCEMENT OF
    THE FAIR HOUSING ORGANIZATIONS AND ORGANIZATIONS
    HAVE AN ESSENTIAL AND CRITICAL ROLE IN THE
    ENFORCEMENT OF THE FAIR HOUSING ACT.................................... 3

    II. PROJECT SENTINEL MEETS THE PLEADING STANDARD FOR
    ALLEGING ORGANIZATIONAL STANDING........................................ 6

        A. UNDER *HAVENS* AND *FAIR HOUSING OF MARIN*,
        STANDING UNDER IS ESTABLISHED BY FRUSTRATION
        OF AN ORGANIZATION'S MISSION AND THE DIVERSION
        OF ITS SCARCE RESOURCES......................................................6

        B. UNDER *PACIFIC PROPERTIES*, AN ORGANIZATION
        ESTABLISHES STANDING AT THE MOTION TO DISMISS
        STAGE BY PLEADING FRUSTRATION OF ITS MISSION
        AND A DIVERSION OF ITS RESOURCES TO COMBAT THE
        DISCRIMINATION AT ISSUE..................................................... 8

        C. PROJECT SENTINEL PLED FACTS ESTABLISHING THAT
        IT HAS ORGANIZATIONAL STANDING AT THE MOTION TO
        DISMISS STAGE............................................................................. 10

        D. DEFENDANTS' ARGUMENTS OPPOSING STANDING
        LACK MERIT .................................................................................12
            1. Activities Undertaken to Counteract Discrimination Need
            Not Be Outside the Organizational Mission to Properly
            Allege Frustration of Mission ................................. 12

            2. Fair Housing Organizations Are Not Required to Prove or
            Quantify Significant Diversion of Resources at the
            Pleading Stage........................................................ 13

CONCLUSION........................................................................................ 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Riga*
208 F.3d 419 (3d Cir. 2000). . . . . . . . 3

*Allen v. Wright*
468 U.S. 737 (1984). . . . . . . . 2, 11

*Chandler v. State Farm Mut. Auto. Ins. Co.*
598 F.3d 1115 (9th Cir. 2010). . . . . . . 2

*Comm. Concerning Cmty. Improvement v. City of Modesto,*
2004 U.S. Dist. LEXIS 31022 (E.D. Cal. 2004). . . . 10

*Comm. for Immigrant Rights v. County of Sonoma,*
644 F. Supp. 2d 1177 (N.D. Cal..2009). . . . 10

*Doe v. Holy*
557 F.3d 1066 (9th Cir. 2009). . . . . . 2

*El Rescate Legal Services, Inc. v. Executive Office of Immigration Review*
959 F.2d 742 (9th Cir. 1991). . . . . . . . 8

*Fair Hous. Council v. Roommate.com, LLC*
666 F.3d 1216 (9th Cir. Cal. 2012). . . . . . 13

*Fair Hous. of Marin v. Combs*
285 F.3d 899 (9th Cir. 2002) . . . . . . . passim

*Geddes v. United Fin. Group,*
559 F.2d 557 (9th Cir. 1977). . . . . . . 7

*Havens Realty Corp. v. Coleman*
455 U.S. 363 (1982). . . . . . . . passim

*Hous. Rights Ctr., Inc. v. Moskowitz*
2004 U.S. Dist. LEXIS 28885 (C.D. Cal. Sept. 20, 2004). . . . 10, 12, 13

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992). . . . . . . . 2, 13

*Lujan* v. *National Wildlife Federation*
497 U.S. 871 (1990). . . . . . . 2

*Nat'l Fair Hous. Alliance v. A.G. Spanos Constr., Inc.*
542 F. Supp. 2d 1054 (N.D. Cal. 2008). . . . . . 9, 12, 13

*Nat'l Fair Hous. Alliance v. Travelers Indem. Co.*,
2017 U.S. Dist. LEXIS 132899 (D.D.C. Aug. 21, 2017).     .     .     12

*National Fair Hous. Alliance, Inc.  v. Prudential Ins. Co. of Am.*,
208 F. Supp. 2d 46 (D.D.C. 2002).     .     .     .     .     12

*Pope v. United States*,
323 U.S. 1 (1944)).     .     .     .     .     .     .     7

*Santiago v. City of L.A.*, 2016 U.S. Dist. LEXIS 172682
(C.D. Cal. Nov. 17, 2016).     .     .     .     .     .     .     10

*Smith v. Pac. Props. & Dev. Corp.*
358 F.3d 1097(9th Cir. 2004).     .     .     .     .     .     passim

*Thomas v. Hous. Auth. of L.A.*,
2005 U.S. Dist. LEXIS 46427 (C.D. Cal. June 2, 2005).     .     .     .9, 12, 13

*Trafficante v. Metropolitan Life Ins. Co.*
409 U.S. 205 (1972).     .     .     .     .     .     .     .     4, 6

*Washington v. Trump*
847 F.3d 1151 (9th Cir. 2017).     .     .     .     .     .     2, 13

**FEDERAL STATUTES**

42 U.S.C. § 3602(d).     .     .     .     .     .     .     .     3

42 U.S.C. § 3602(i)(1).     .     .     .     .     .     .     3

42 U.S.C. § 3613(a).     .     .     .     .     .     .     .     3

**FEDERAL REGULATIONS**

24 C.F.R. Part 125.     .     .     .     .     .     .     .     4

**LAW REVIEW ARTICLES**

Teresa C. Hunter and Gary L. Fischer,
 *Fair Housing Testing – Uncovering Discriminatory Practices*,
28 Creighton L. Rev. 1127 (1995).     .     .     .     .     3

Robert G. Schwemm, *Private Enforcement of the Fair Housing Act*,
6 Yale L. & Pol.  Rev. 375 (1988).     .     .     .     .     .     5

1

**OTHER AUTHORITIES**

2

DB Consulting Group, Inc.,

3

*Study of the Fair Housing Initiatives Program* (2011). .      .      .      4

4

HUD, *Housing Discrimination Against Racial and Ethnic Minorities 2012:*

5

*Executive Summary* (June 2013). .      .      .      .      .      .      4

6

National Fair Housing Alliance,

*The Case for Fair Housing: 2017 Fair Housing Trends Report* (2017).      4, 5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
PL. PROJECT SENTINEL'S OPP.TO DEFS'. MOT. TO
DISMISS
*JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

## INTERESTS OF AMICI CURIAE

1

2    The National Fair Housing Alliance, Inc. ("NFHA") is a non-profit corporation that

3 is dedicated to ending discrimination in housing. NFHA represents approximately 75

4 private, non-profit fair housing organizations throughout the country. NFHA and its

5 members work to ensure equal housing opportunities for all people in their communities and

6 engage in efforts to end segregation.  Relying on the Fair Housing Act and Supreme Court

7 standing decisions interpreting it, NFHA and its members have undertaken important

8 enforcement initiatives in cities and states across the country including California. They

9 regularly educate the housing, lending and insurance industries to comply with the Fair

10 Housing Act, accept and investigate complaints alleging housing discrimination and

11 participate as plaintiffs in federal and state court litigation brought under federal and state

12 fair housing laws.  NFHA and its members' efforts have contributed significantly to the

13 nation's efforts to eliminate housing segregation and discriminatory housing practices.

14    Located in Los Angeles, the Housing Rights Center is the largest organization in

15 California dedicated to ending housing discrimination and a member of NFHA.  To achieve

16 its goal of ending housing discrimination, the Housing Rights Center actively promotes and

17 supports fair housing in the communities it serves through education, advocacy, and

18 enforcement.

19    Eight  other NFHA members located in California join NFHA and Housing Rights

20 Center as amici curiae. Eden Council for Hope and Opporunity; Fair Housing Advocates of

21 Northern California (formerly Fair Housing of Marin); Fair Houising Council of Orange

22 County; Fair Housing Council of Riverside County,  Inc.; Fair Housing Council of the San

23 Fernando Valley; Fair Housing Foundation; Fair Housing Napa Valley and Inland Fair

24 Housing and Mediation Board ("Amici") are non-profit, public interest fair housing

25 organizations located in communities throughout California.

26    The Supreme Court and appellate courts have for decades upheld the

27 standing of fair housing organizations such as Amici to bring lawsuits under the Fair

28 Housing Act. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Fair*

1    *Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).

2         Amici's interests will be adversely affected by a decision imposing greater burdens

3    on fair housing organizations to establish standing at the motion to dismiss stage. As

4    discussed in greater detail below, granting the motion to dismiss Project Sentinel

5    significantly curtails the pleading standard for alleging organizational standing at the motion

6    to dismiss stage.  Amici thus have a strong interest in participating in this case and

7    describing the importance of fair housing organizations to enforcing the Fair Housing Act

8    and setting forth the proper pleading standards that apply to fair housing organizations for

9    alleging organizational standing.

10                              **STANDARD OF REVIEW**

11        Once a defendant has moved to dismiss for lack of subject matter jurisdiction, a

12   plaintiff bears the burden of establishing the Court's jurisdiction. *See Chandler v. State*

13   *Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). The plaintiff carries that

14   burden by putting forth "the manner and degree of evidence required" by whatever stage of

15   the litigation the case has reached. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992);

16   *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017). "At the pleading stage, general

17   factual allegations of injury resulting from the defendant's conduct may suffice, for on a

18   motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts

19   that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan* v. *National*

20   *Wildlife Federation*, 497 U.S. 871, 883-889 (1990)); *see also Doe v. Holy See*, 557 F.3d

21   1066, 1073 (9th Cir. 2009) (when a motion to dismiss attacks subject-matter jurisdiction on

22   the face of the complaint, the court assumes the factual allegations in the complaint are true

23   and draws all reasonable inferences in the plaintiff's favor.  ) "In many cases the standing

24   question can be answered chiefly by comparing the allegations of the particular complaint to

25   those made in prior standing cases." *Allen v. Wright*, 468 U.S. 737, 751-752 (1984)

26

27

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
                                      PL. PROJECT SENTINEL'S OPP. TO DEFS'. MOT. TO
                                      DISMISS
                                      *JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

1

## <u>ARGUMENT</u>

2

I.     **THE FAIR HOUSING ACT PROVIDES FOR ENFORCEMENT OF THE
       FAIR HOUSING ACT THROUGH FAIR HOUSING ORGANIZATIONS AND
       ORGANIZATIONS HAVE AN ESSENTIAL AND CRITICAL ROLE IN THE
       ENFORCEMENT OF THE FAIR HOUSING ACT**

3

4

5        The primary purpose of fair housing organizations such as Amici and Project

Sentinel is "to help provide equal housing opportunities for people living within the targeted

6

geographical area of the organization." Teresa C. Hunter and Gary L. Fischer, *Fair Housing*

7

*Testing – Uncovering Discriminatory Practices*, 28 Creighton L. Rev. 1127,1131 (1995).

8

Fair housing organizations typically engage in several different activities consistent with

9

their mission including: "(1) educating the public regarding fair housing laws; (2)

10

counseling individuals who believe they may have been the subject of unlawful

11

discrimination; (3) receiving and investigating complaints regarding housing discrimination;

12

and (4) referring appropriate cases to conciliation, attorneys, or enforcement agencies for

13

resolution." *Id*. at 1131-32.

14        The Fair Housing Act itself provides for its enforcement through fair housing

15

organizations.  The Fair Housing Act allows for civil actions by "aggrieved persons." The

16

Fair Housing Act defines an aggrieved person as "any person who has been injured by a

17

discriminatory housing practice," and defines "person" to include "corporations,"

18

"associations" and "unincorporated organizations." 42 U.S.C. § 3602(d) (defining person);

19

42 U.S.C. § 3602(i)(1)(defining an "aggrieved person as "any person who (1) claims to have

20

been injured by a discriminatory housing practice; or (2) believes that such persons will be

21

injured by a discriminatory housing practice that is about to occur"); 42 U.S.C. §

22

3613(a)("an aggrieved person may commence a civil action . . ."). The Act thus provides for

23

enforcement actions by organizations such as Amici and Project Sentinel, non-profit

24

corporations. *See Alexander v. Riga*, 208 F.3d 419, 427 (3d Cir. 2000) (fair housing

25

organization was an "aggrieved person" under the Act). In bringing such actions, fair

26

housing organizations act as "private attorneys general in vindicating a policy Congress

27

considered to be of the highest priority."  *Trafficante v. Metropolitan Life Ins. Co.*, 409

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
PL. PROJECT SENTINEL'S OPP.TO DEFS'. MOT. TO
DISMISS
*JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

1   U.S. 205, 211 (1972).

2        Fair housing organizations have been at the forefront of educating the community

3   about fair housing and rooting out housing discrimination for nearly 50 years.  Private non-

4   profit fair housing organizations process and investigate the largest number of fair housing

5   complaints in the country. In 2016, fair housing organizations investigated 70 percent of all

6   fair housing complaints filed in the United States, which is almost twice the number of

7   complaints filed with all federal, state, and local government agencies combined, even

8   though non-profit organizations have far fewer resources.  National Fair Housing Alliance,

9   *The Case for Fair Housing: 2017 Fair Housing Trends Report*, at 50 (2017)(hereinafter

10  "NFHA Trends Report").  Fair housing organizations are also effective in enforcing the Fair

11  Housing Act. According to a 2011 study commissioned by the Department of Housing and

12  Urban Development (HUD), 71 percent of fair housing cases filed with HUD in which a fair

13  housing organization is a complainant or co-complainant result in conciliation or a finding

14  of reasonable cause, as opposed to 37 percent of cases not referred to HUD by a fair housing

15  organization.  DB Consulting Group, Inc., *Study of the Fair Housing Initiatives Program*, at

16  55 (2011).

17       With knowledge about the communities they serve, fair housing organizations are

18  able to discern the modes and targets of discrimination in their local communities. Housing

19  discrimination has changed from blatant discrimination to less easily detectable

20  discrimination that requires more sophisticated investigations to detect. HUD, *Housing*

21  *Discrimination Against Racial and Ethnic Minorities 2012: Executive Summary*, at 1-2

22  (June 2013). Nevertheless, housing discrimination remains pervasive through actions such

23  as offering different terms of lease or sale, steering, and misrepresentations about housing

24  availability. Such subtle forms of discrimination make it impossible for an individual to

25  recognize that they were treated differently because of a protected characteristic. Fair

26  housing organizations, however, employ effective investigative techniques that uncover

27  both large scale and less obvious forms of discrimination that would otherwise go

28  undiscovered. For example, fair housing organizations employ civil rights testing, an

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
PL. PROJECT SENTINEL'S OPP.TO DEFS'. MOT. TO
DISMISS
*JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

1   investigatory tool where individuals pose as homeseekers to determine whether housing

2   providers are treating individuals differently based on a protected characteristic. Testing has

3   been recognized as the most effective way to detect more insidious forms of housing

4   discrimination. NFHA Trends Report, *supra*, at 51.

5         Recognizing the importance of fair housing organizations to assisting the community

6   in understanding rights and responsibilities under the Fair Housing Act and fostering

7   compliance with Fair Housing Act, in 1987 Congress created the Fair Housing Initiatives

8   Program (FHIP). *See* 24 C.F.R. Part 125 (regulations implementing the Fair Housing

9   Initiatives Program).  FHIP is a competitive grant program that provides funding to fair

10  housing organizations to counteract discrimination in the rental, sales, lending and insurance

11  markets through education and outreach and enforcement grants. "FHIP funding is a critical

12  component of the U.S. civil rights enforcement infrastructure."   DB Consulting Group, Inc.,

13  *supra*, at iii.

14        The importance of fair housing organizations to the education of the public and the

15  housing, lending and insurance industries regarding their rights and responsibilities under

16  the Fair Housing Act and its effective enforcement cannot be understated.  As the leading

17  legal commentator on fair housing noted:

18        Housing suppliers simply behave differently if they are operating in an area
      with an active fair housing organization that is engaged in extensive testing

19        and general compliance monitoring. In addition, local organizations can make
      a vital contribution to the public's understanding of and support for the

20        concept of fair housing; in the long run, this may be more important than
      litigation in eradicating housing discrimination. As important as these non-

21        litigation strategies are, however, they generally require at least the threat of
      effective litigation to back them up. Therefore, the key to effective fair

22        housing enforcement in a given area has usually been the existence of a
      vigorous private organization that can support litigation.

23

24  Robert G. Schwemm, *Private Enforcement of the Fair Housing Act*, 6 Yale L. & Pol.

25  Rev. 375, 383 (1988).

26

27

28

1  **II.  PROJECT SENTINEL MEETS THE PLEADING STANDARD FOR ALLEGING ORGANIZATIONAL STANDING**

2

3   **A.  UNDER *HAVENS* AND *FAIR HOUSING OF MARIN*, STANDING IS ESTABLISHED BY FRUSTRATION OF AN ORGANIZATION'S MISSION AND THE DIVERSION OF ITS SCARCE RESOURCES**

4

5       In enacting the Fair Housing Act, Congress intended to define standing as broadly as

6  permitted by Article III of the Constitution. *Trafficante*, 409 U.S. 205, 209 (1972). The sole

7  requirement for standing to sue under the Fair Housing Act "is Article III minima injury in

8  fact: that the plaintiff allege that as a result of the defendant's actions he suffered a 'distinct

9  and palpable injury.'" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).  Under

10 *Havens*, a fair housing organization establishes standing when it suffers "a concrete and

11 demonstrable injury with a consequent drain on the organization's resources" or an

12 impairment in its non-economic interest in encouraging open housing.  *Id*. at 370.

13     In *Havens*, the plaintiffs sued a realty company and one of its employees for steering

14 African-American home seekers. The plaintiffs included a fair housing organization,

15 Housing Opportunities Made Equal ("HOME"). HOME's mission was to make equal

16 opportunity housing a reality. *Id*. at 368. Just as is true of Project Sentinel, HOME's

17 activities "included the operation of a housing counseling service and the investigation and

18 referral of complaints concerning housing discrimination." *Id*. Similarly, just as occurred

19 here, HOME had conducted an investigation of defendants' real estate practices and sued

20 after the investigation revealed discriminatory conduct.

21     HOME's complaint alleged that it had been "frustrated by defendants' racial steering

22 practices in its efforts to assist equal access to housing through counseling and other referral

23 services" and "had to devote significant resources to identify and counteract the defendant's

24 racially discriminatory steering practices." *Id*. The Court concluded that if the allegations

25 were true, there was no doubt that the organization suffered injury in fact:

26      In determining whether HOME has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual: Has the plaintiff

27      "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction"

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
PL. PROJECT SENTINEL'S OPP. TO DEFS'. MOT. TO
DISMISS
*JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

1    *Id.* at 378-79 (citations omitted).

2           Under this test, standing clearly existed:

3           If, as broadly alleged, petitioners' steering practices have perceptibly impaired
            HOME's ability to provide counseling and referral services for low- and
4           moderate-income homeseekers, there can be no question that the organization
            has suffered injury in fact. Such a concrete and demonstrable injury to the
5           organization's activities—with the consequent drain on the organization's
            resources—constitutes far more than simply a setback to the organization's
6           abstract social interests.

7    *Id.* at 379.

8           In *Fair Housing of Marin v. Combs*, the Ninth Circuit followed *Havens* and held that

9    a fair housing organization has standing to sue under the Fair Housing Act.  *Fair Hous. of*

10   *Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).  The defendant challenged Fair

11   Housing of Marin's standing both at the motion to dismiss stage and on appeal after the

12   district court entered a default judgment against the defendant for discovery misconduct.  *Id.*

13   at 902. Just as has occurred here, Fair Housing of Marin had received complaints of racial

14   discrimination, conducted an investigation and brought a lawsuit after the investigation

15   indicated that the defendant discriminated.  *Id.*  Just like Project Sentinel, Fair Housing of

16   Marin's mission is to promote equal housing opportunities.  *Id.* at 902.  Fair Housing of

17   Marin, similar to Project Sentinel, alleged in its complaint that, "as a result of defendant's

18   discriminatory practices, it has 'suffered injury to its ability to carry out its purposes …[and]

19   economic losses in staff pay, in funds expended in support of volunteer services, and in the

20   inability to undertake other efforts to end unlawful housing practices.'"[1] *Id.* at 905.  The

21   district court held that "fairly construed, [Fair Housing of Marin] complains that defendant's

22   discrimination against African Americans has caused it to suffer injury to its ability to

23   provide outreach and education (i.e., counseling)."  *Id.*

24   ─────────────────

        [1] The allegations of the complaint in *Fair Housing of Marin* were taken as true as a result of the
25   default.  *See Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) ("The general rule of
        law is that upon default the factual allegations of the complaint, except those relating to the amount
26   of damages, will be taken as true.") (citing *Pope v. United States*, 323 U.S. 1, 12 (1944)).

27

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
                                         PL. PROJECT SENTINEL'S OPP. TO DEFS'. MOT. TO
                                         DISMISS
                                         *JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

1      The Ninth Circuit also found that the record supported the district court's finding that

2  Fair Housing of Marin's resources were diverted to investigating and other efforts to

3  counteract the discrimination.  *Id.*  Because the appeal challenged Fair Housing of Marin's

4  standing after judgment and Fair Housing of Marin was required to offer proof of its

5  standing at that stage of the proceedings, the court noted that the district court found that

6  Fair Housing of Marin incurred $14,217 in diversion of resources damages and $16,317 in

7  frustration of mission damages. *Id.*  The Court concluded that, "Fair Housing of Marin has

8  direct standing to sue because it showed a drain on its resources from both a diversion of its

9  resources and frustration of its mission." *Id.*; *see also El Rescate Legal Services, Inc. v.*

10  *Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (immigrant

11  rights organizations established standing by alleging that the defendant's policy frustrated

12  their goals and required them "to expend resources in representing clients they otherwise

13  would spend in other ways.").

14      **B. UNDER *PACIFIC PROPERTIES*, AN ORGANIZATION ESTABLISHES
       STANDING AT THE MOTION TO DISMISS STAGE BY PLEADING
15     FRUSTRATION OF ITS MISSION AND A DIVERSION OF ITS
       RESOURCES TO COMBAT THE DISCRIMINATION AT ISSUE**
16

17      In *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004), the Ninth

18  Circuit set forth the pleading standard for pleading organizational standing at the motion to

19  dismiss stage.  Under *Havens* and *Fair Housing of Marin*, the Ninth Circuit held that "an

20  organization may satisfy the Article III requirement of injury in fact if it can demonstrate:

21  (1) frustration of its organizational mission; and (2) diversion of its resources to combat the

22  particular housing discrimination in question." *Id.* (citing *Fair Housing of Marin*, 285 F.3d

23  at 905).  In *Pacific Properties*, a disability rights organization, Disability Rights Action

24  Committee (DRAC), conducted an investigation of multifamily properties to determine if

25  they met the accessibility requirements of the Fair Housing Act.  385 F.3d at 1099.  The

26  Ninth Circuit held the plaintiff organization met both prongs of the test for standing at the

27  motion to dismiss stage.  *Id.* at 1105-6.

28      First, the Ninth Circuit held that the organization met the test for frustration of

1    mission at the motion to dismiss stage.  DRAC alleged that it is a non-profit corporation

2    "organized with the principal purpose of helping to eliminate discrimination against

3    individuals with disabilities by ensuring compliance with laws intended to provide access to

4    housing[.]"  *Id.* at 1105.  The Ninth Circuit held that DRAC satisfied the requirements for

5    pleading frustration of mission at the motion to dismiss stage because "[a]ny violation of the

6    FHAA would therefore constitute a 'frustration of [DRAC's] mission'" and DRAC had

7    alleged violations of the FHAA in its complaint.  *Id.*

8         Second, the court held that DRAC satisfied the pleading standard for pleading

9    diversion of resources.  The Ninth Circuit noted:

10            DRAC specifically stated in its complaint that "in order to monitor the
             violations and educate the public regarding the discrimination at issue, DRAC
11           has had (and, until the discrimination is corrected, will continue) to divert its
             scarce resources from other efforts to promote awareness of--and compliance
12           with--federal and state accessibility laws and to benefit the disabled
             community in other ways (for example, DRAC's efforts to free disabled
13           persons from nursing homes.)[.]"

14    *Id.*  Because courts "presume that 'general allegations embrace those specific facts that are

15    necessary to support a claim,'" *id.* at 1106 (quoting *Lujan*, 497 U.S. at 889), the Ninth

16    Circuit concluded that DRAC's allegations were sufficient to constitute a showing of

17    diversion of resources at the motion to dismiss stage. *Id.*

18         Following *Pacific Properties*, district courts in California have consistently held that

19    fair housing organizations meet the pleading standard for organizational standing by broadly

20    alleging frustration of mission and diversion of resources. *Nat'l Fair Hous. Alliance v. A.G.*

21    *Spanos Constr., Inc.*, 542 F. Supp. 2d 1054, 1063-64 (N.D. Cal.  2008) (holding that a fair

22    housing organization met the pleading standard for frustration of mission by alleging that

23    defendants "'have forced Plaintiffs to divert significant and scarce resources to identify,

24    investigate, and counteract the [] Defendants' discriminatory practice and such practices

25    have frustrated Plaintiffs' other efforts against discrimination.'"); *Thomas v. Hous. Auth. of*

26    *L.A.*, 2005 U.S. Dist. LEXIS 46427 at *53-55  (C.D. Cal. June 2, 2005) (fair housing

27    organization had standing under the FHA because the organization alleged that "defendants'

28    conduct has 'frustrated the mission of [the organization], . . . caused [the organization] to

1   divert its resources, [and] caus[ed] it to suffer economic losses in staff pay, and in the

2   inability to undertake other efforts to end unlawful housing practices.'"); *Hous. Rights Ctr.,*

3   *Inc. v. Moskowitz*, 2004 U.S. Dist. LEXIS 28885 at *4-6 (C.D. Cal. Sept. 20, 2004) (holding

4   that fair housing organization established standing to challenge racial and familial status

5   discrimination in violation of the FHA by alleging that organization's mission was to ensure

6   equal opportunity in housing and organization devoted resources to investigating

7   defendant's practices including surveying and interviewing tenants).[2]

8   **C.   PROJECT SENTINEL PLED FACTS ESTABLISHING THAT IT HAS**
        **ORGANIZATIONAL STANDING AT THE MOTION TO DISMSIS**
9       **STAGE**

10      Project Sentinel meets the pleading standard for alleging organizational standing at

11  the motion to dismiss stage under *Fair Housing of Marin* and *Pacific Properties*.

12      First, Project Sentinel has alleged frustration of its mission.  Similar to Fair Housing

13  of Marin, Project Sentinel's mission "includes the promotion of equal opportunity in rental

14  housing and the elimination of all forms of housing discrimination."  Cf. (Compl. ¶ 12.)

15  with *Fair Hous.of Marin*, 285 F.3d at 902 (plaintiff's mission was to promote equal housing

16  opportunities).  Just as in *Pacific Properties*, any violation of the Fair Housing Act is a

17  direct conflict with Project Sentinel's mission to ensure equal opportunity in housing and

18  constitutes a frustration of Project Sentinel's mission.  *See Pac. Props. & Dev. Corp.*, 358

19  _____

20  [2] DistrIct courts in California have also consistently held that other types of organizations
    have organizational standing based on similar allegations.  *Comm. for Immigrant Rights v. County*
21  *of Sonoma*, 644 F. Supp. 2d 1177, 1195 (N.D. Cal..2009) (immigrant rights organization had
    standing to sue for civil rights violations based on unlawful immigration enforcement policies
22  because its "mission of opposing anti-immigrant policies is frustrated as a result of defendants'
    actions, and that the Committee has diverted resources to combat defendants' policies"); *Comm.*
    *Concerning Cmty. Improvement v. City of Modesto*, 2004 U.S. Dist. LEXIS 31022 at *20-22 (E.D.
23  Cal. 2004) (community organization met the pleading standard for diversion of resources by
    alleging that community organization's resources were diverted from efforts to improve the
24  neighborhood to efforts to call attention to the lack of municipal resources and therefore had
    standing to challenge the lack of municipal resources under the FHA and other civil rights laws);
25  *Santiago v. City of L.A.*, 2016 U.S. Dist. LEXIS 172682 at *20-22 (C.D. Cal. Nov. 17, 2016)
    (organization devoted to the legalization of street vending had standing to challenge illegal seizures
26  and confiscations of personal property because it diverted resources to assist members who had
    been subject to illegal seizures and confiscations rather than other aspects of its organizational
27  mission).

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
PL. PROJECT SENTINEL'S OPP.TO DEFS'. MOT. TO
DISMISS
*JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

1   F.3d at 1105.

2        Second, Project Sentinel pled that it was forced to divert its resources to identify and

3   counteract the discrimination.  Similar to *Pacific Properties*, Project Sentinel alleged that it

4   had to divert its scarce resources from other efforts to promote fair housing to activities to

5   identify and counteract the discrimination such as an investigaiton.  Cf. Compl. ¶¶ 81 ("As a

6   result of Defendants' discriminatory activities, Project Sentinel was forced to invest

7   significant financial and staff resources into investigating the subject property") and ¶ 82

8   ("Defendants' discriminatory conduct forced Project Sentinel to divert its scarce resources

9   away from other programs and activities it would have undertaken, such as counseling and

10  referral, educational programs, and outreach, to instead identify and counteract Defendants'

11  unlawful housing practices.") with *Pac. Props. & Dev. Corp.*, 358 F.3d at 1105

12  (organization forced to divert its scarce resources from other efforts promote compliance

13  and awareness of accessibility laws to monitoring the defendants' violations); *Allen*, 468

14  U.S. at 751-752.(the standing question can be answered chiefly by comparing the

15  allegations of the particular complaint to those made in prior standing cases).

16       Just as in *Havens* and *Fair Housing of Marin*, Project Sentinel pled that the diversion

17  of resources impaired its ability to provide counseling and referral services. Cf. Compl. ¶ 82

18  ("Defendants' discriminatory practices perceptibly impaired Project Sentinel's ability to

19  provide counseling and referral services for home seekers by requiring it to instead devote

20  resources to specific activities and programs to counteract Defendants' discriminatory

21  housing practices.") with *Havens*, 455 U.S. at 372 ( "If, as broadly alleged, petitioners'

22  steering practices have perceptibly impaired HOME's ability to provide counseling and

23  referral services for low- and moderate-income homeseekers, there can be no question that

24  the organization has suffered injury in fact.") and *Fair Housing of Marin*, 285 F.3d at 905

25  (noting that the district court found that the fair housing organization "complains that

26  defendant's discrimination against African Americans has caused it to suffer injury to its

27  ability to provide outreach and education (i.e., counseling).").

28       Project Sentinel thus has pled facts supporting organizational standing under *Havens*

1   at pleading stage.

2   **D.  DEFENDANTS' ARGUMENTS OPPOSING STANDING LACK MERIT**

3   **1.    Activities Undertaken to Counteract Discrimination Need Not Be Outside the Organizational Mission to Properly Allege Frustration of Mission**

4

5   Defendants make two main arguments opposing Project Sentinel's standing. Both of

6   Defendants' arguments lack merit.

7   Defendants argue that actions undertaken by a fair housing organization to counteract

8   discrimination must be outside of the organizational mission to properly plead frustration of

9   mission at the pleading stage.  However, in the Ninth Circuit, the only pleading requirement

10  to properly allege frustration of mission of a fair housing organization's mission to promote

11  equal housing opportunity is an allegation of a violation of the Fair Housing Act.  *See Pac.*

12  *Props. & Dev. Corp.*, 358 F.3d at 1105.  Project Sentinel's mission is to promote equal

13  opportunity in housing, it alleged violations of the Fair Housing Act and thereby properly

14  pled frustration of mission at the pleading stage.

15  As a recent district court noted, Defendants' argument that activities undertaken to

16  counteract discrimination must be outside an organization's mission "'borders both on the

17  offensive and absurd.'" *Nat'l Fair Hous. Alliance v. Travelers Indem. Co.*, 2017 U.S. Dist.

18  LEXIS 132899 at *17 (D.D.C. Aug. 21, 2017) (quoting *National Fair Hous. Alliance, Inc.*

19  *v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 53-54 (D.D.C. 2002)).  "Nothing in the

20  FHA, standing jurisprudence, or common sense supports [Defendants'] position." *Travelers*

21  *Indem. Co.*, 2017 U.S. Dist. LEXIS 132899 at *17.  In nearly all cases in which an

22  organization has been held to have standing, the organization's activities that demonstrate

23  standing are consistent with the mission of promoting fair housing.  *See, e.g.*, *Havens*, 455

24  U.S. at 368; *Fair Housing of Marin*, 385 F.3d at 905; *Fair Hous. Council v. Roommate.com,*

25  *LLC*, 666 F.3d 1216, 1219 (9th Cir. Cal. 2012); *Nat'l Fair Hous. Alliance v. A.G. Spanos*

26  *Constr., Inc.*, 542 F. Supp. at 1063-64; *Thomas*, 2005 U.S. Dist. LEXIS 46427 at *53-55;

27  *Moskowitz*, 2004 U.S. Dist. LEXIS 28885 at *4-6; *id.*

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF PL. PROJECT SENTINEL'S OPP.TO DEFS'. MOT. TO DISMISS
*JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD

**2.  Fair Housing Organizations Are Not Required to Prove or Quantify Significant Diversion of Resources at the Pleading Stage**

Defendants next argue that Project Sentinel must quantify its diversion of resources and prove a significant diversion of resources at the pleading stage.  This argument fails as a matter of law.  To establish standing, a plaintiff must put forth the degree of evidence required by whatever stage of the litigation the case has reached. *Lujan,* 504 U.S. at 561; *Washington v. Trump*, 847 F.3d at 1159. In the Ninth Circuit, a fair housing organization meets the pleading standard by alleging that it had to divert its scarce resources from other efforts to promote awareness and compliance with fair housing laws to efforts to identify and counteract the defendant's fair housing violations.  *Pac. Props. & Dev. Corp*., 358 F.3d at1105.  Project Sentinel met the pleading standard by alleging that it was forced to divert resources from its other programs and activities such as counseling to activities to identify and counteract the defendant's discrimination

It is true that in *Fair Housing of Marin*, the Ninth Circuit noted that the plaintiff fair housing organization was awarded damages for diversion of resources.  *Fair Hous. of Marin*, 285 F.3d at 905.  But the defendant in *Fair Housing of Marin* challenged standing on appeal after a judgment had been entered against it.  At the appeal stage of the proceeding, Fair Housing of Marin was required to *prove* diversion of its resources to activities to counteract the discrimination.

Nothing in the Ninth Circuit organizational standing jurisprudence suggests that a fair housing organization must prove and quantify significant diversion of resources at the motion to dismiss stage.  Other district courts in California have **not** required fair housing organizations to quantify diversion of resources at the pleading stage but instead have held that fair housing organizations have standing at the pleading stage by broadly alleging diversion of resources. *Nat'l Fair Hous. Alliance v. A.G. Spanos Constr., Inc*., 542 F. Supp. 2d at1063-64; *Thomas*, 2005 U.S. Dist. LEXIS 46427 at *53-55; *Moskowitz,* 2004 U.S. Dist. LEXIS 28885 at *4-6.

1

**CONCLUSION**

2          Amici urge the court to deny the motion to dismiss.

3   Dated: September 13, 2017.

4                                          Respectfully Submitted,

5                                          D. SCOTT CHANG
                                           AZADEH HOSSEINIAN
6                                          HOUSING RIGHTS CENTER

7                                          MORGAN WILLIAMS
                                           NATIONAL FAIR HOUSING ALLIANCE

8                                          By ____/s/ D. Scott Chang_____
                                                          D. Scott Chang
9

10                                         Attorneys for Amici Curiae
                                           NATIONAL FAIR HOUSING ALLIANCE;
                                           HOUSING RIGHTS CENTER; EDEN
11                                         COUNCIL FOR HOPE AND
                                           OPPORTUNITY; FAIR HOUSING
12                                         ADVOCATES OF NORTHERN
                                           CALIFORNIA; FAIR HOUSING
13                                         COUNCIL OF ORANGE COUNTY; FAIR
                                           HOUSING COUNCIL OF RIVERSIDE,
14                                         INC.; FAIR HOUSING COUNCIL OF THE
                                           SAN FERNANDO VALLEY; FAIR
15                                         HOUSING FOUNDATION; FAIR
                                           HOUSING NAPA VALLEY and INLAND
16                                         FAIR HOU*SING & MEDIATION
                                           BOARD

17

18

19

20

21

22

23

24

25

26

27

28

CORRECTED BRIEF OF AMICICI CURIAE IN SUP. OF
                                           PL. PROJECT SENTINEL'S OPP.TO DEFS'. MOT. TO
                                           DISMISS
                                           *JIMENEZ V. TSAI* CASE NO. 5:16-CV-4434-EJD